**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS**

**Mark Anthony Robinson,**

   **Plaintiff,**

v.                 **Case No. 08-2645-JWL**

**United Parcel Service, Inc.,**

   **Defendant.**

## **MEMORANDUM AND ORDER**

Plaintiff Mark Anthony Robinson filed suit against his former employer, United Parcel Service, Inc. (UPS), alleging that UPS, based on plaintiff's race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., terminated his employment and, thereafter, refused to reduce plaintiff's termination to a suspension through the union grievance process. This matter comes before the court on defendant's motion for summary judgment (doc. 85). As will be explained, the motion is granted in part and denied in part.

**I. Facts**

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Mark Robinson is African-American. He began working for UPS in 1986 and he became a full-time package car driver in 1991. He remained employed as a package car driver until his employment was terminated on March 12, 2008. During his employment with UPS, plaintiff was a member of Teamsters Local 41 Union.

On March 12, 2008, plaintiff and Veronica McCoy, one of UPS's office management

specialists, had a conversation in Ms. McCoy's office concerning the delivery and subsequent pickup of a particular package. The conversation escalated to an argument during which plaintiff raised his voice to Ms. McCoy, used profanity and twice struck his fist on her desk with some force. As soon as plaintiff left her office, Ms. McCoy telephoned Keith Wolford, UPS's business manager, to tell him about the incident. In the meantime, John Sears, an African-American UPS supervisor who happened to overhear the incident, entered Ms. McCoy's office and spoke with Ms. McCoy about what had occurred. He also spoke with Denise Wilson, a UPS employee who had been in Ms. McCoy's office during the incident with plaintiff.

Mr. Sears contacted Mr. Wolford and Don Lewick, UPS's labor manager, over the telephone and advised them that he believed that plaintiff's conduct constituted a violation of UPS's policy against workplace violence and that plaintiff's employment should be terminated. Mssrs. Wolford and Lewick agreed with that decision and, shortly thereafter, Mr. Sears advised plaintiff that his employment was terminated. Mr. Sears escorted plaintiff to the parking lot but testified that the situation was "cordial." Ms. McCoy, in contrast, requested that UPS security escort her to her car at the end of her shift because she still felt concerned for her safety in light of the incident with plaintiff. The following day, UPS interviewed several employees who witnessed or otherwise had knowledge of the incident in Ms. McCoy's office. Those employees, including Ms. McCoy and Ms. Wilson, also provided written statements to UPS.

Plaintiff filed a grievance concerning the termination of his employment and that grievance was pursued on his behalf by Teamsters Local 41. At UPS, the first step in the grievance process is a local level hearing where the grievant and his or her union representatives

meet with UPS representatives and discuss the grievance. Often times, the parties are able to resolve the grievance at this step through a compromise. Indeed, plaintiff's evidence supports an inference that UPS routinely "compromises" terminations to suspensions (even when those terminations are for violations of the policy against workplace violence) and returns terminated employees to work. If the grievance is not resolved, the grievance moves to the second step of the process–a hearing before a two-state panel comprised of both union and company representatives who resolve the issue.

Mr. Lewick, Mr. Wolford and Jamie Diaz, UPS's division manager, participated in plaintiff's local level hearing on behalf of UPS. Plaintiff's evidence supports an inference that Mr. Lewick is typically the primary decisionmaker on behalf of UPS at local level hearings. Despite the union's effort to have UPS agree at the local level hearing to reduce plaintiff's termination to a suspension, UPS refused to do so. According to UPS, it refused to reduce plaintiff's termination because the termination was plaintiff's fourth termination in an 11-month period and because of the severity of plaintiff's conduct on March 12, 2008.[1] Because the grievance was deadlocked at the local level hearing, plaintiff's grievance proceeded to a hearing before the two-state panel.

Mr. Lewick prepared and presented UPS's case to the two-state panel. In the written

---

[1] The record reflects that plaintiff's employment was terminated in April 2007 for his involvement in a car accident while driving a UPS package car; in June 2007 for allegedly sexually harassing a female UPS employee; and in October 2007 for failing to deliver 18 packages in a single day. On each occasion, plaintiff filed a grievance and his terminations were each compromised at the local level hearing such that plaintiff was returned to work after a period of suspension.

3

materials constituting Mr. Lewick's presentation, Mr. Lewick included a paragraph concerning another male African-American employee, "Donald," who had previously been terminated for violating UPS's policy against workplace violence. The incident involving employee "Donald" did not concern or involve plaintiff in any respect. According to Mr. Lewick, the paragraph was mistakenly included as a result of Mr. Lewick's "cutting and pasting" his written presentation concerning plaintiff's termination from a previous written presentation concerning a termination for workplace violence. While he ultimately did not read the entirety of that paragraph aloud and admitted to the panel that he had the "wrong" person in the written materials, Mr. Lewick nonetheless misrepresented plaintiff's disciplinary history by stating that "This is not the first time this year that Mark has been terminated for workplace violence." The panel denied plaintiff's grievance.

Additional facts will be related, as necessary, in connection with the court's analysis of defendant's motion and plaintiff's particular claims.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3*

*Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro, Inc*., 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

### III. Analysis

In the pretrial order, plaintiff asserts two claims of race discrimination under Title VII. First, he asserts that defendant terminated his employment based on his race. Second, he asserts that defendant, during the grievance process, refused to reduce plaintiff's termination to a

suspension at the local level hearing. Because plaintiff's claims are based on circumstantial evidence, the court analyzes the claims under the familiar three-step *McDonnell Douglas* burden-shifting framework. *See Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1210 (10th Cir. 2010). First, plaintiff must make a prima facie case of discrimination. *Id.* at 1210-11. Second, UPS then must articulate a legitimate, nondiscriminatory reason for the adverse employment actions. *Id.* at 1211. Third, the burden then shifts back to plaintiff, who must prove by a preponderance of the evidence that UPS's reasons are a pretext for unlawful discrimination. *Id.*

Defendant moves for summary judgment on both claims on the grounds that plaintiff has not come forward with sufficient evidence to establish a prima facie case of discrimination and, in any event, has not shown that defendant's legitimate, nondiscriminatory reasons for its actions are pretextual. As will be explained, the court rejects defendant's argument concerning plaintiff's prima facie case. With respect to plaintiff's termination claim, the court concludes that plaintiff has not come forward with sufficient evidence of pretext to warrant a jury trial on this claim and the court grants summary judgment on the claim. With respect to plaintiff's claim that defendant refused to reduce his termination to a suspension at the local level hearing, the court concludes that plaintiff has come forward with sufficient evidence from which a jury could reasonably conclude that defendant's proffered reasons for its refusal are pretextual. Summary judgment on this claim, then, is denied.

According to defendant, plaintiff cannot establish the requisite prima facie case of discrimination because he cannot show that UPS's decision to terminate plaintiff's employment

6

or its refusal to reduce plaintiff's termination to a suspension "occurred under circumstances which give rise to an inference of discrimination." To support its argument, however, UPS simply points to the evidence underlying its articulated reasons for terminating plaintiff's employment and refusing to reduce plaintiff's termination to a suspension. UPS, then, suggests that plaintiff must disprove defendant's proffered reasons for its employment decisions in order to establish a prima facie case. As the Tenth Circuit has recognized, such a legal analysis would inappropriately short-circuit the *McDonnell Douglas* framework at the prima facie stage and frustrate plaintiff's ability to establish that defendant's proffered reasons are pretextual. *See, e.g., EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192-94 (10th Cir. 2000) (and cases cited therein). In the absence of any other arguments from defendant concerning plaintiff's prima facie case, the court turns to consider the real dispute in this case–whether plaintiff has come forward with sufficient evidence that defendant's proffered reasons for its employment decisions are pretextual.

According to defendant's evidence, UPS terminated plaintiff's employment based on the March 12, 2008 incident in Ms. McCoy's office. More specifically, UPS contends that plaintiff's employment was terminated because his conduct on March 12, 2008 violated UPS's policy prohibiting violence in the workplace. Defendant's evidence also indicates that UPS refused to reduce plaintiff's termination to a suspension because the termination was plaintiff's fourth termination in an 11-month period and because of the severity of plaintiff's conduct on March 12, 2008. Defendant has satisfied its burden of production and the burden shifts back to plaintiff to demonstrate that defendant's proffered reason is pretextual. *Fischer v. Forestwood*

*Co.*, 525 F.3d 972, 979 (10th Cir. 2008).

To establish pretext, plaintiff must show that UPS's proffered nondiscriminatory explanations for its actions are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Johnson*, 594 F.3d at 1211. The court begins with plaintiff's pretext evidence with respect to UPS's termination decision. In support of his argument that defendant's proffered reason for terminating his employment is pretextual, plaintiff first contends that UPS has purposefully exaggerated the involvement of Mr. Sears in the decisionmaking process and has "created a fiction" that Mr. Sears, an African-American, terminated plaintiff's employment so that the decision "will look better." Plaintiff urges that the record evidence demonstrates that Mr. Sears was simply the "messenger" and that Mr. Wolford and Mr. Lewick actually made the termination decision. According to plaintiff, UPS's efforts to "prop up" Mr. Sears as the decisionmaker constitutes affirmative evidence of UPS's race-conscious decisionmaking process.

The court has carefully reviewed all of the evidence concerning Mr. Sears' participation in the decision to terminate plaintiff's employment and cannot conclude that defendant has misrepresented Mr. Sears' role in that decision. As an initial matter, defendant has never suggested that Mr. Sears was the sole decisionmaker. Indeed, in response to plaintiff's interrogatories, defendant identified three individuals who participated in the decision–Mr. Sears, Mr. Wolford and Mr. Diaz. By way of explanation, defendant stated in an interrogatory response that Mr. Sears, after discussing the March 12, 2008 incident with Ms. McCoy, determined that plaintiff's conduct violated UPS's policy against workplace violence and

8

contacted Mr. Wolford to discuss the situation, who "concurred with Mr. Sears' decision to terminate plaintiff." By way of affidavit, Mr. Sears avers that he "decided to terminate Mr. Robinson's employment" and called Mr. Wolford to discuss the decision with him. According to Mr. Sears, Mr. Wolford "concurred" with his decision.

While Mr. Sears' deposition testimony is not as clear, that testimony is not inconsistent with the other evidence in the record concerning Mr. Sears' role in the decision. In his deposition, Mr. Sears testified that he did not make the termination decision on his own, but involved Mr. Wolford and Mr. Lewick in the decision. While Mr. Sears testified at one point that he was "instructed" to terminate plaintiff's employment, a full reading of his deposition testimony indicates that he was more than a mere messenger with respect to the decision. Rather, he initiated the discussion with Mssrs. Wolford and Lewick concerning plaintiff's termination and, ultimately, Mssrs. Wolford and Lewick "agreed it was a workplace violence issue and agreed to terminate his employment." UPS, then, has not exaggerated Mr. Sears' role in the decisionmaking process.

In a related vein, plaintiff also accuses defendant of purposefully downplaying or "hiding" Mr. Lewick's role in the termination decision. Again, the court has carefully reviewed the evidence and cannot conclude that defendant was attempting to "hide" Mr. Lewick's involvement. To be sure, plaintiff is correct that UPS did not identify Mr. Lewick as a participant in the decision in either its July 2009 initial disclosures or its November 2009 interrogatory responses. But the record contains no evidence suggesting that this omission was intentional. Indeed, Mr. Sears freely testified in December 2009 that he consulted with Mr.

Lewick in the termination decision and Mr. Lewick's January 2010 affidavit states that he was personally involved in the decision.[2] Since that time, UPS has not attempted to shy away from that fact and certainly includes that fact in its opening brief. In short, the uncontroverted facts simply do not support a conclusion that UPS was unwilling or reluctant to identify Mr. Lewick as a participant in the termination decision.

Finally, plaintiff contends that UPS has exaggerated the severity of the March 12, 2008 incident. By way of example, plaintiff highlights the alleged discrepancy between Mr. Sears' testimony that he did not watch plaintiff get into his car after escorting him to the parking lot because the situation was "cordial" with defendant's evidence that Ms. McCoy and Ms. Wilson requested security escorts to their vehicles after work because they still felt threatened by plaintiff. The court discerns no inconsistency here. It is reasonable that Ms. McCoy, as the person directly involved in the confrontation with plaintiff, might perceive the situation differently than a person who was not a party to the incident.

Plaintiff also contends that the written witness statements obtained by UPS on March 13, 2008 simply do not support the idea that plaintiff posed a violent threat to Ms. McCoy. The issue, however, is not whether those statements reflect that plaintiff in fact posed a violent threat

---

[2] Plaintiff contends that Mr. Lewick testified in his deposition that he did not become involved in plaintiff's situation until the day following plaintiff's termination. But Mr. Lewick's testimony on this issue is ambiguous as a result of counsel's question. Plaintiff's counsel asked: "In Mark Robinson's situation in March 2008, did you get involved the day after the incident?" Mr. Lewick responded, "Yes." The testimony, then, could support an inference that he did not become involved until the day after the incident, but could also support an inference that his involvement continued the day after the incident.

to Ms. McCoy but whether they support UPS's contention that it believed that plaintiff had violated UPS's policy against violence in the workplace–a policy that is broad enough to include "intimidating" conduct. Without exception, the witness statements support UPS's conclusion that plaintiff violated UPS's policy.³ For this reason, too, plaintiff's complaint that Ms. McCoy "started" the confrontation by directing profanity at plaintiff in the first instance and that UPS failed to consider her responsibility in the confrontation simply does not undercut UPS's assertion that it terminated plaintiff's employment based on its belief that his conduct violated defendant's policy against workplace violence.

Plaintiff, then, has not come forward with evidence sufficient to cast doubt on defendant's assertion that it terminated plaintiff's employment because his conduct on March 12, 2008 violated UPS's policy prohibiting violence in the workplace. In fact, much of plaintiff's evidence demonstrates that UPS routinely terminates employees regardless of race who engage in acts of workplace violence. In that regard, plaintiff has submitted evidence concerning the disciplinary histories of numerous other employees in an effort to show that UPS, at least with respect to non-African-American employees, routinely reduces termination decisions to suspensions at local level hearings. While that aspect of the evidence will be discussed in more detail in connection with plaintiff's claim concerning defendant's refusal to reduce his

---

³Plaintiff also suggests that the statements of these witnesses raise material factual issues concerning whether the witnesses were "coached" by defendant in drafting their statements and to what extent these witnesses declined to provide statements about Ms. McCoy's responsibility for the confrontation. While these subjects may have been appropriate areas of exploration in the context of a deposition, plaintiff's desire to inquire into these areas is insufficient to create a material factual issue for trial.

termination, a review of these employees' disciplinary histories reflects that UPS consistently terminates employees regardless of race when those employees engage in conduct constituting workplace violence. This evidence, then, supports UPS's argument that plaintiff's race had no bearing on the decision to terminate plaintiff's employment on March 12, 2008. Defendant's motion for summary judgment on this claim is granted.

The court turns, then, to plaintiff's pretext evidence with respect to defendant's refusal to reduce plaintiff's termination to a suspension at the local level grievance hearing. As noted above, defendant contends that it refused to reduce plaintiff's termination to a suspension because the termination was plaintiff's fourth termination in an 11-month period and because of the severity of plaintiff's conduct on March 12, 2008. The evidence reflects that Mssrs. Lewick, Wolford and Diaz were present at the local level hearing on plaintiff's grievance. Viewed in the light most favorable to plaintiff, however, the evidence further reflects that Mr. Lewick, as the labor manager responsible for presenting the company's case at the next level, was the primary decisionmaker for the company at local level hearings concerning whether to reduce a termination to a suspension or whether to proceed to the two-state panel.

Focusing on Mr. Lewick, then, as the primary person responsible for refusing to reduce plaintiff's termination to a suspension, plaintiff argues that defendant's proffered reasons for refusing to reduce plaintiff's termination to a suspension are pretextual because Mr. Lewick misrepresented plaintiff's disciplinary history during his presentation to the two-state panel by telling the panel that plaintiff had previously been terminated for workplace violence and that plaintiff had "issues" with aggressive behavior. Plaintiff also points to evidence suggesting that

Mr. Lewick routinely agreed to reinstate Caucasian employees who had been terminated for workplace violence.

The court begins with the evidence concerning Mr. Lewick's presentation to the two-state panel. It is uncontroverted that the written materials submitted by Mr. Lewick to the panel contained a paragraph concerning another African-American employee, Donald, who had been terminated earlier in the year for workplace violence but then returned to work with a suspension. Indeed, Mr. Lewick's written presentation contains only 4 substantive paragraphs and one of those paragraphs (the longest paragraph at that) has nothing at all to do with plaintiff.[4] Moreover, in his oral remarks to the panel, Mr. Lewick clearly stated that "This is not the first time this year that [plaintiff] has been terminated for workplace violence." That statement is undisputedly false. Although at that point in his oral presentation Mr. Lewick advised the panel that the next paragraph in his written presentation concerned the "wrong" person, he did not correct his statement about plaintiff's disciplinary history and still concluded his oral remarks with the statement that "[plaintiff] has issues with his aggressive behavior," a statement that appears to have been based on the situation concerning the other African-American employee.

Defendant contends that Mr. Lewick simply made an innocent mistake as a result of "cutting and pasting" his written presentation from a previous written presentation concerning a termination for workplace violence and that the mistake is of no consequence because Mr.

---

[4]While some copies of Mr. Lewick's written presentation contain an "x" mark through the paragraph concerning "Donald," other copies do not have the paragraph marked out and it is unclear which copy was submitted to the panel.

Lewick corrected his mistake in his oral remarks to the panel and the panel clearly was not confused about plaintiff's disciplinary history. In other words, defendant contends that the panel understood the correct facts about plaintiff's disciplinary history and was not prejudiced by Mr. Lewick's mistake. But plaintiff here is not challenging the panel's decision to deny plaintiff's grievance, so it makes no difference whether the panel was prejudiced by Mr. Lewick's statements or was misled about plaintiff's disciplinary history. Plaintiff challenges Mr. Lewick's decision at the local level hearing to refuse to reduce plaintiff's termination to a suspension. Viewing the evidence in the light most favorable to plaintiff, then, Mr. Lewick's written and oral remarks before the two-state panel are at least sufficient to undercut Mr. Lewick's credibility and may support an inference that Mr. Lewick, in refusing to reinstate plaintiff at the local level hearing, was influenced by racial bias because he was attributing to plaintiff the acts of another African-American employee without concern for whether his decision was based on accurate information. In short, Mr. Lewick's misstatements about plaintiff are sufficiently suspicious to give rise to an inference of pretext.

Moreover, plaintiff has come forward with additional evidence from which a reasonable jury could reasonably conclude, coupled with Mr. Lewick's statements at the two-state hearing, that defendant's proffered reasons are not worthy of belief. In that regard, plaintiff has submitted the disciplinary records of numerous Caucasian employees who were terminated for violating the company's policy against workplace violence but were subsequently reinstated to their positions after their terminations were reduced to suspensions at the local level hearing on the employee's grievance. Plaintiff, then, is attempting to prove pretext by demonstrating that UPS

treated him "differently from similarly situated employees who violated work rules of comparable seriousness in order to show that the employer failed to follow typical company practice in its treatment" of plaintiff." *Swackhammer v. Sprint/United Management Co.*, 493 F.2d 1160, 1167-68 (10th Cir. 2007).

UPS asserts several objections to plaintiff's differential treatment argument. First, UPS contends that the disciplinary records submitted by plaintiff are unsworn and unverified such that they constitute inadmissible hearsay that cannot be considered by the court on summary judgment. To be sure, plaintiff has not submitted an affidavit or deposition testimony authenticating the documents at issue. But the requirement of authentication can be satisfied with any "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (quoting Federal Rule of Evidence 901(a)). In the absence of an authenticating affidavit, a district court considers each document to determine whether the document has been sufficiently authenticated, taking into consideration the "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances." *Id*. at 1171 (quoting Federal Rule of Evidence 901(b)(4)). Here, the court concludes that the documents are sufficiently authenticated. Each document proffered by plaintiff concerning the disciplinary records of other employees was undisputedly produced by UPS and bears a UPS Bates-stamp. The documents appear to have been generated by defendant's human resources software program or otherwise constitute official-looking UPS discipline forms. To the extent these documents contain handwritten notations, there is simply

15

no suggestion that the documents have been altered in any way or that the documents are not what plaintiff claims.

Defendant next contends that the employees highlighted by plaintiff are not similarly situated to plaintiff because those employees had different managers and supervisors than plaintiff and some even worked in different facilities than plaintiff. Thus, these employees necessarily had different management personnel involved at their local level hearings. Defendant's argument, however, ignores that Mr. Lewick, as defendant's labor manager for at least its Kansas City facilities, participated in the local level hearings of these employees regardless of whether a particular employee worked in UPS's Lenexa facility or its Kansas City facility. Moreover, plaintiff's evidence suggests that Mr. Lewick would have been the primary decisionmaker in the local level hearings of these employees. Indeed, Mr. Lewick testified that, as the labor manager for UPS's Kansas district, he is responsible for promoting and maintaining consistency with respect to employee discipline. Viewing the evidence in the light most favorable to plaintiff, then, a reasonable jury could conclude that the employees identified by plaintiff are similarly situated to plaintiff because Mr. Lewick is not only a common decisionmaker at the local level hearings of these employees but also the primary decisionmaker at those hearings.

In a related vein, defendant contends that the employees highlighted by plaintiff are not similarly situated to plaintiff because there is insufficient evidence to determine whether those employees engaged in conduct as serious as plaintiff's conduct and because it is undisputed that none of the employees had four terminations in an 11-month period like plaintiff. While the

16

nature of each employee's conduct is not clear from the records submitted, at least one of those employees appears to have committed an act of workplace violence more serious than that committed by plaintiff–his termination form indicates that he was terminated for hitting his supervisor. Moreover, each of the employees, like plaintiff, was terminated for "workplace violence." With respect to plaintiff's disciplinary history, there is some question raised by the record as to whether that history even played a part in the decision to refuse to reduce plaintiff's termination to a suspension at the local level hearing. Although Mr. Lewick avers that plaintiff's disciplinary history factored into the decision, Mr. Wolford, who was also present at the hearing and participated in the decision, testified that the decision was made because plaintiff "had an issue with workplace violence and we didn't need him back to work." To the extent a jury believes that plaintiff's disciplinary history was given little or no weight in the decision to refuse to reduce plaintiff's termination, then of course the disciplinary histories of other employees would not be relevant to the differential treatment analysis.

In any event, for plaintiff to establish pretext through differential treatment, he must show only that other employees "violated work rules of comparable seriousness" (all employees here violated UPS's policy against workplace violence) and that those employees dealt with the same supervisor and were subject to the same standards governing discipline (Mr. Lewick participated in the local level hearings for the employees). *Id*. at 1171 n.11. Plaintiff, then, has made the requisite showing for purposes of summary judgment. While defendant contends that the employees are not similarly situated to plaintiff because they had dissimilar disciplinary histories, defendant is, in fact, arguing that any discrepancy in treatment between plaintiff and

17

these employees is explained by a nondiscriminatory reason–plaintiff's disciplinary history. *See id.* at 1171-72. Defendant, of course, is free to present this evidence to the jury and the jury may reasonably conclude that any discrepancy in treatment is justified. But the court, on this record, cannot conclude that UPS treated plaintiff differently than other employees because of his disciplinary history.

In short, viewing the evidence in the light most favorable to plaintiff, genuine issues of fact exist as to whether defendant's proffered reasons for refusing to reduce plaintiff's termination to a suspension at the local level hearing are pretextual. Summary judgment on this claim is denied.


**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 85) is granted in part and denied in part.


**IT IS SO ORDERED.**


Dated this 2nd day of April, 2010, at Kansas City, Kansas.


                                                s/ John W. Lungstrum
                                                John W. Lungstrum
                                                United States District Judge